UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANN BURT, | : | Case No. 1:15-cv-225 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| MAPLE KNOLL | : | |
| COMMUNITIES, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER:

### (1) GRANTING DEFENDANT NATIONAL CHURCH'S MOTION FOR SUMMARY JUDGMENT (Doc. 17); and

### (2) DENYING DEFENDANTS MAPLE KNOLL AND BOLIN'S MOTION FOR SUMMARY JUDGMENT (Doc. 19)

This civil action is before the Court on Defendants' motions for summary

judgment (Docs. 17, 19), and the parties' responsive memoranda (Docs. 24, 27, 28).[1]

## I. BACKGROUND FACTS

This case arises from the circumstances surrounding the termination of Plaintiff

Ann Burt from her position with Maple Knoll and her employment with National Church.

From June 17, 2013 to February 18, 2014, National Church employed Plaintiff as a

contract employee working as a Service Coordinator for Maple Knoll.

---

[1] Defendants include Maple Knoll Communities, Inc. ("Maple Knoll"), Beth Bolin, and National Church Residences Housing Group, Inc. ("National Church") (collectively "Defendants"). During the course of this litigation, Ms. Bolin was married and her legal name is now Elizabeth Thress. However, for purposes of clarity, Defendants continue to refer to her as "Beth Bolin." (Doc. 19 at 1 n.1).

On February 6, 2014, Dante Getz, a maintenance worker, allegedly walked into Plaintiff's office, pulled out his cell phone, and showed her a photograph of a penis, which he identified as his own by holding his own thumb against a thumb in the photograph.  Plaintiff subsequently reported the incident to Getz's supervisor.  Beth Bolin, the HR director at Maple Knoll, conducted an investigation into the incident.  Getz admitted that he had shown something "inappropriate" to Plaintiff and was terminated. Bolin also investigated Plaintiff's actions and determined that Plaintiff had fostered a relationship with Getz.  On February 18, 2014, Bolin requested that the National Church remove Plaintiff from the Service Coordinator position.  National Church terminated Plaintiff that same day.

Plaintiff initiated this action alleging three separate claims: (i) retaliation against Maple Knoll and National Church in violation of Title VII of the Civil Rights Act of 1964; (ii) retaliation against Maple Knoll and National Church in violation of the Ohio Fair Employment Practices Act ("FEPA"); and (3) sexual harassment against Beth Bolin under Ohio common law.  (Doc. 24 at 2).

Defendants maintain that they are entitled to judgment as a matter of law on all of Plaintiff's claims.

# I.    UNDISPUTED FACTS[2]

## A.    National Church Group

1. Headquartered in Columbus, Ohio, National Church is engaged in the business of Property Management and Supportive Social Services.  (Doc. 1-1, Ex. 2).

2. As part of its core business, National Church enters into contracts with the owners and managers of affordable senior living communities to provide Service Coordinators and other staff who work directly with the residents at those communities.  (Doc. 17-1 at ¶ 2).

3. In 2010, National Church executed a Resident Service Coordination Services Agreement ("Agreement") with Maple Knoll, the owner of multiple residential communities including Corbly Trace and Mountain View Terrace.  (Doc. 17-2, Ex. 1).  The Agreements were renewed through June 30, 2014.  (*Id.*)

4. Consistent with the Agreement, National Church also agreed to provide Maple Knoll a Resident Service Coordinator to serve in its facilities.  (*Id.*)

5. Plaintiff sought employment with National Church, specifically applying for the job of Service Coordinator at Maple Knoll.  (Doc. 23 at 10-11).  Wendy Foraker, National Church's Portfolio Manager of Enriched Housing Services, was responsible for conducting Plaintiff's initial interview.  (*Id.*)

6. Following her initial interview with Foraker and the administration of National Church's preemployment test, Plaintiff was required to participate in a second Interview with Maple Knoll.  Maple Knoll had to approve Plaintiff before National Church would decide to employ her.  (*Id.*)

7. Plaintiff signed an employment agreement with National Church on June 4, 2013, outlining many of the terms and conditions of her employment.  Per the agreement, Plaintiff's effective hire date was June 17, 2013.  (Doc. 21-1 at 19, Ex. 2).

8. Plaintiff's employment agreement contains the following provision: "In the event that the owner/management agent that has contracted with National Church Residences to provide service coordination to their site, requests that the employee be removed from the site due to dissatisfaction with the Employee's

---

[2]  *See* Doc. 17 at 2-9, Doc. 19-1, and Doc. 26.

performance, Employer reserves the right to terminate this Agreement with the Employee." (Doc. 21-1, Ex. 2).

9. Plaintiff acknowledges it was the property owner's prerogative to ask for her removal and terminate the Agreement. (Doc. 21-1 at 21).

10. Plaintiff testified that she was an "at-will" employee. (Doc. 21-1 at 20). Moreover, upon employment Plaintiff executed an "employee acknowledgement" averring that she received a copy of the Employee Information Guide of National Church Residences, which contains the following statement: "Your employment with National Church Residence is 'at will' which means you may be terminated at any time and for any reason not prohibited by applicable law, with or without advanced notice." (Doc. 21-1, Ex. 1).

11. As a Service Coordinator, Plaintiff was responsible in assisting residents with remaining independent. In her own words she focused on "arranging if they needed home health, if they needed meals on wheels, if they needed something to do; just keeping them independent; transportation issues." (Doc. 21-1 at 22). Additionally, Plaintiff performed the duties listed in Attachment A to the employment agreement. (Doc. 21-1 at 22, Ex. 2).[3]

14. On Thursday, February 6, 2014, Plaintiff contacted Foraker about an incident that allegedly occurred with Maple Knoll maintenance employee Getz at a Maple Knoll facility. Plaintiff explained to Foraker that Getz had showed her a picture of his penis on his cell phone while in her office. (Doc. 21-1 at 35-36; Doc. 23 at 12). Both Foraker and Plaintiff testified that during the initial call, Plaintiff requested that Foraker not take action inasmuch as Plaintiff would handle the situation with Maple Knoll. Plaintiff's testimony confirms this exchange:

Q: So it was your intention – tell me, was it your intention to take—to bring the issue to [Maple Knoll] yourself?
A: Yes…
Q: …Did you indicate to [Foraker], at the time, during this conversation, that you had addressed the situation by telling [Getz] it was inappropriate and you felt that handled the situation?
A: Yes…

(Doc. 21-1 at 38-39).

---

[3] Plaintiff notes that these duties were determined jointly by Maple Knoll and National Church and set forth in the Resident Service Coordination Services Agreement at Schedules 1 and 2. (Doc. 17-2, Ex. 1).

15. A few days later, on Tuesday, February 11, 2014, Plaintiff notified Maple Knoll about Getz's alleged misconduct. Specifically, she informed Joyce Leathers, Director of HUD Operations for Maple Knoll about the alleged incident with Getz. (Doc. 21-1 at 41; Doc. 21-4 at 5). Plaintiff was familiar with Leathers inasmuch as the two women met approximately twice a month and corresponded by email regarding Plaintiff's interaction with community residents. (Doc. 21-4 at 10). Moreover, Leathers was Getz's ultimate supervisor. (Doc. 21-1 at 42).

16. After Plaintiff explained that Getz had shown a picture of his penis, Leathers stated that she would need to contact Maple Knoll's Human Resources regarding the incident. (Doc. 21-1 at 41).

17. The same day she informed Leathers of her allegations, Plaintiff met with Vondie Wheeler who was employed in Maple Knoll's Human Resources Department. (Doc. 21-1 at 43). Wheeler inquired about the factual circumstances surrounding Getz's interaction with Plaintiff. (*Id.* at 44). At Wheeler's request, Plaintiff documented the incident in writing and emailed the account to Wheeler on February 13, 2014. (*Id.* at 46, Ex. 4).

18. Following her discussion with Wheeler, Plaintiff placed a call to Foraker and explained that she had made Maple Knoll aware of Getz's behavior. (Doc. 23 at 16).

19. Sometime between February 11 and February 14, 2014, Foraker contacted Leathers and inquired as to what steps were being taken by Maple Knoll with respect to Plaintiff's allegations. (Doc. 23 at 17-18). Leathers informed Foraker that Maple Knoll was investigating the allegations:

Q: Okay. And was there anything resolved? Did you figure out what you needed to do?
A: Well, I felt I was at a good place. I mean, it was out of my hands at this point. [Leathers] let me know that her HR department was opening an investigation.
Q: Okay.
A: And at that point in time, I was satisfied with that because that's all I could do at this point.

(Doc. 23 at 18-19).

20. As National Church's Portfolio Manager of Enriched Housing Services, Foraker did not conduct an investigation independent of the one conducted by Maple Knoll's human resources department inasmuch as she had no reason to doubt the accuracy of the information collected by Maple Knoll and alternatively did not have access to Maple Knoll's employees and residents who allegedly provided factual statements regarding Plaintiff's conduct.  (Doc. 23 at 30; Doc. 17-1 at ¶ 4).  Given Maple Knoll's investigation, Foraker did not interview Maple Knoll's residents, employees, or review any documents or information inasmuch as "it wasn't [her] investigation."  (*Id.*)  Instead, she adhered to the request made by the Maple Knoll Human Resources Personnel who actually conducted the investigation:

> Q: That was a decision that was made by the people whoever did the investigation at [Maple Knoll], correct?
> A: Correct.
> Q: Not necessarily your opinion?
> A: That is correct.

(Doc. 23 at 27).

21. Thus, when Foraker contacted Plaintiff on February 18, 2014, she informed the Service Coordinator that she was being removed from the property at Maple Knoll's request.  Additionally, she told Plaintiff that she was being terminated by National Church.  (Doc. 23 at 27-29)  Plaintiff testified that she could not recall exactly what Foraker told her on the call other than the fact that her employment with National Church was being terminated.  (*Id.* at 49).

22. Following her termination from National Church, Plaintiff never contacted the Company again to see if another position became available.  (Doc. 21-1 at 49).

23. Plaintiff filed a charge with the Equal Employment Opportunity Commission on April 4, 2014 alleging her termination from National Church constituted retaliation for reporting Getz's sexual harassment.  (Doc. 1 at ¶ 18).

24. After the Commission dismissed the charge on January 27, 2015, Plaintiff filed this lawsuit.  (Doc. 1 at ¶ 18).

25. Plaintiff brings causes of action against National Church for retaliation in violation of Title VII of the Civil Rights Act of 1964 and O.R.C. § 4112.02(I).  (Doc. 1 at ¶¶ 42-107).

**B.**     **Beth Bolin and Maple Knoll Communities, Inc.**

1.  National Church paid Plaintiff's salary, established her benefits, and approved her vacation and PTO.  (Doc. 21-1 at 59).

2.  While assigned to Maple Knoll, Plaintiff worked at two properties owned by Maple Knoll: Corbly Trace and Mt. View Terrace.  (Doc. 21-1 at 21).

3.  Four Maple Knoll employees also worked at the same two sites: Joycelyn Leathers, Maple Knoll's Director of HUD Operations; Doris Kosar, Occupancy Manager; Michael Clayton, Maintenance Supervisor; and Dante Getz, Maintenance Helper.  (Doc. 21-4 at 5; Doc. 21-3 at 9; Doc. 21-2 at 8-9).

4.  On Thursday, February 6, 2014, Mr. Getz came into Plaintiff's office at Maple Knoll and showed her a picture of a penis on his cell phone.  (Doc. 21-1 at 26, Ex. 3).  Plaintiff's response was to ask "Who is that?"  (*Id.*)  Mr. Getz asked Plaintiff what she thought of the picture, but she did not give a verbal response.  (*Id.* at 29).  Mr. Getz then left Plaintiff's office.  (*Id.*)

5.  Plaintiff contacted her supervisor, Ms. Foraker, to report the incident.  (Doc. 21-1 at Ex. 3; Doc. 23 at 12).

6.  Ms. Foraker offered to report the incident to Maple Knoll's Department of Human Resources, but Plaintiff told Ms. Foraker that she would handle it herself.  (Doc. 21-1 at 39, Ex. 3; Doc. 23 at 12-13).

7.  On February 10 or 11, 2014, Plaintiff first reported the incident to Maple Knoll.  (Doc. 21-3 at 15, 17).

8.  Plaintiff spoke initially with Ms. Kosar who suggested that she should contact Ms. Leathers, Maple Knoll's supervisor for Corbly Trace and Mt. View Terrace.  (Doc. 21-3 at 21).

9.  Plaintiff contacted Ms. Leathers shortly thereafter, and upon hearing her report, Ms. Leathers involved Maple Knoll's Employment Manager, Vondie Wheeler.  (Doc. 21-4 at 14).

10. On February 13, 2014, Ms. Wheeler reported to Beth Bolin, Maple Knoll's Vice President of Human Resources, that she had been investigating Plaintiff's report. She reported that she had interviewed Plaintiff, Mr. Clayton, and Mr. Getz with regard to the incident.  (Doc. 21-5 at 18).  Together, Ms. Wheeler and Ms. Bolin

also interviewed Ms. Kosar.  (Doc. 21-3 at 32, 62-63).

11. On February 13, 2014, Ms. Bolin and Ms. Wheeler determined that Mr. Getz's employment should be suspended, and he was suspended that same day.  (Doc. 21-5 at 25).

12. Ultimately, as a result of the investigation, on February 17, 2014, Plaintiff's employment at Maple Knoll was terminated.  (Doc. 21-5 at 39).

13. During the investigation into Mr. Getz's misconduct, the Maple Knoll employees interviewed by Ms. Wheeler and Ms. Bolin told them about the flirtatious character of the relationship between Mr. Getz and Plaintiff that existed prior to this incident.  (Doc. 21-5 at 23, 31, 34, 52-54, 56, 61).[4]

14. On Monday, February 17, 2014, Maple Knoll requested that National Church provide a different Service Coordinator.  (Doc. 21-4 at 31).

## III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

---

[4] Plaintiff claims that the statements made by Maple Knoll employees constitute inadmissible hearsay.

8

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

### A.    Retaliation

First, Plaintiff claims that Defendants Maple Knoll and National Church retaliated against her in violation of the anti-retaliation provision of Title VII.  To prove a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) she engaged in a protected activity under Title VII; (2) defendants were aware of the activity; (3) plaintiff was subject to an adverse employment action; and (4) there was a causal nexus between plaintiff's protected activity and the adverse employment action.  *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012).[5]  Defendants only contest the third and fourth prongs of the *prima facie* test.

---

[5] Plaintiff's complaint asserts claims for retaliation under Title VII and Ohio Revised Code Chapter 4112.  In analyzing claims arising under Chapter 4112, Ohio courts have adopted the same framework established in federal case law concerning Title VII.  *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 731 (Ohio 2000).

### 1. *Maple Knoll*[6]

Maple Knoll claims that the retaliation claims fail as a matter of law because: (1) the claims apply only against an "employer" and Maple Knoll does not fit that definition; (2) there is no direct evidence of unlawful retaliation and Plaintiff cannot meet her burdens under *McDonnell-Douglas*; and (3) even if Plaintiff can establish a *prima facie* case of retaliation, Maple Knoll has legitimate non-discriminatory business reasons for their conduct and Plaintiff is unable to provide evidence that those reasons were merely pretextual.

### a. Employer

As a threshold matter, Maple Knoll argues that it was not Plaintiff's employer and therefore cannot be held liable. (Doc. 19 at 8-11). Pursuant to 42 U.S.C. Section 2000e and Ohio Revised Code Chapter 4112, an "employer" is prohibited from retaliating against an employee for engaging in protected activity. 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or

---

[6] It is unclear whether Plaintiff also alleges Title VII retaliation claims against Bolin. Any Title VII claim against Bolin fails as a matter of law for two independent reasons. First, Plaintiff failed to include Bolin as a party to her Charge of Discrimination, which prevents this Court from exercising jurisdiction over statutory claims asserted against her. *Johnson v. Cleveland City School Dist.*, 344 F. App'x 104, at *5 (6th Cir. 2009). *See generally*, 42 U.S.C. Section 2000e-5(f)(1)(authorizing suit only "against the respondent named in the charge" of unlawful employment practice). Second, Title VII does not include a cause of action against individuals because individual supervisors, co-workers and managers are not "employers" and therefore cannot generally be held liable for discrimination under Title VII and related statutes. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 406 (6th Cir. 1997). *Wathen v. General Electic Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Accordingly, any Title VII claim against Bolin is dismissed for lack of jurisdiction and/or for failure to state a claim upon which relief may be granted.

more employees… and any agent of such person…"); Ohio Rev. Code § 4112.01

("'Employer' includes… any person employing four or more persons within the state,

and any person acting directly or indirectly in the interest of an employer.").  Therefore,

"[i]n order to show a defendant is liable, the plaintiff first must show the defendant is her

employer."  *Sampson v. Sisters of Mercy of Willard*, No. 3:12cv824, 2015 U.S. Dist.

LEXIS 84108, at *9 (N.D. Ohio June 2, 2015).  There are two ways to establish that a

party is a plaintiff's employer: the plaintiff "may show that the defendant is formally her

employer" or the plaintiff may demonstrate that the defendant nevertheless has a

"sufficiently significant relationship with the plaintiff's employer to be considered an

'employer' under federal and state law."  *Id.* at 9-10.

Entities are joint employers if they "share or co-determine those matters governing

essential terms and conditions of employment."  *Carrier Corp v. NLRB*, 768 F.2d 778,

781 (6th Cir. 1985).  "In determining whether entities are joint employers, courts consider

'an entity's ability to hire, fire, or discipline employees, affect their compensation and

benefits, and direct and supervise their performance.'"  *Id.*[7]

National Church was Plaintiff's formal employer.  In order to hold Maple Knoll

liable for retaliation, Plaintiff must establish that the relationship between Maple Knoll

and National Church is sufficiently significant to justify characterizing Maple Knoll as

her employer.

---

[7] *See also NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982) ("Where two or more employers exert significant control over the same employees— where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers'").

National Church hired Plaintiff in accordance with the Resident Service Coordination Services Agreement, the contract between Maple Knoll and National Church governing the terms and conditions of Plaintiff's employment. (Doc. 17-2, Ex. 1). In that Agreement, the parties negotiated the specific job duties of the Service Coordinator position. (*Id.* at 1, ¶ 1.1). Additionally, Maple Knoll was to designate a "Facility Manager" to oversee Plaintiff's activities. (*Id.* at 3, ¶ 3). However, in practice, Plaintiff met with Leathers and Kosar twice a month to review the services she was obtaining for residents. (Doc. 21-4 at 10). The parties agreed to an hourly rate to be paid by Maple Knoll to National Church for each hour worked by the Service Coordinator, which capped the amount paid by National Church to its employee. (Doc. 17-2, Ex. 1 at 3, ¶ 51). Maple Knoll also retained the right to approve those hired by National Church (Doc. 23 at 11), and the right to, in its sole discretion, remove the Service Coordinator if deemed "unsatisfactory." (Doc. 17-2, Ex. 1 at ¶ 1.4.2).

Maple Knoll hired and fired Plaintiff, and determined the amount she was compensated. Accordingly, a reasonable jury could conclude that Maple Knoll and National Church jointly controlled Plaintiff's position sufficient to characterize Maple Knoll as her employer.

### b. *Prima facie case*

Under Title VII, a plaintiff can establish a claim of retaliation by direct evidence or through circumstantial evidence. "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both."

*Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348-49 (6th Cir. 1997). Here, Plaintiff alleges that she can establish a claim of retaliation using either direct or indirect evidence. An employee who presents direct evidence of improper motive does not bear the burden of disproving other possible non-retaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive. *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). [8]

Here, after Plaintiff reported the incident to management, she was extremely uncomfortable at work. (Doc. 21-1 at 44). Plaintiff became frustrated at the slow pace of the investigation, particularly when a resolution had been promised forthwith and none was forthcoming. (Doc. 24, Ex. H). Bolin, after receiving reports from Kosar of Plaintiff's increasing agitation (Doc. 21-5 at 43), determined that Plaintiff's continued employment at Maple Knoll would be disruptive: "[M]y main concern about that related to the residents of those properties that grew very close to those individuals and would wonder and ask a lot of questions, and I was not comfortable with how [Plaintiff] was

---

[8] Direct evidence is that evidence "which, if believed, requires the conclusion that the unlawful discrimination was at least a motivating factor in the employer's actions." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469 (6th Cir. 2005).

portraying the situation." (*Id.* at 102).[9] This "concern," which Bolin stated was a factor in her decision to terminate Plaintiff, can be offered as direct evidence of a retaliatory animus. "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Marks v. Ohio Bell Tel. Co.*, No. 1:10cv1293, 2011 U.S. Dist. LEXIS 84508, at *15 (N.D. Ohio Aug. 2, 2011) (quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2002)).

### i.    Adverse Employment Action

Assuming, *arguendo*, that Plaintiff has not evidenced a claim of retaliation by direct evidence, the Court will consider whether Plaintiff has established a *prima facie* case through circumstantial evidence.

In the context of a Title VII discrimination claim, an adverse employment action is defined as a "materially adverse change in the terms or conditions" of employment. *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). An adverse

---

[9] Maple Knoll argues that by omitting the testimony which immediately precedes this statement, Plaintiff has misrepresented the nature of Bolin's "main concern." That preceding testimony reads: "The second factor was related to my concern that she was not comfortable in the workplace and that she may not be returning and that she was concerned about Mike or Dante, and that she was also portraying the situation in a light that was what I felt not completely accurate. And my main concern about that related to the residents of those properties that grew very close to those individuals and would wonder and ask a lot of questions, and I was not comfortable with how she was portraying the situation." (Doc. 21-5 at 102). This testimony was given in response to questioning about email correspondence sent from Ms. Bolin to National Church, documenting Maple Knoll's request to have Plaintiff reassigned. (*Id.* at 101). In that correspondence, Ms. Bolin similarly expresses her concern about how Plaintiff is "portraying the situation," stating that "Ann portrays Donte [sic] as being a scary, sexual predator…" (Doc. 17-2 at 18). Maple Knoll argues that Bolin's statement does not refer to Plaintiff's report of sexual harassment, but rather to the exaggerated and unsubstantiated way she had begun to talk about Mr. Getz. Maple Knoll's argument is not persuasive. The simple fact is that absent Plaintiff's allegations of sexual harassment, she would not have been terminated.

employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Adverse employment action "requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762. In addition, it typically "inflicts direct economic harm." *Id.*

Bolin made a request to National Church that Plaintiff be removed from Maple Knoll. Pursuant to their Agreement, this request did not require National Church to terminate Plaintiff's employment, and there is no indication that Bolin requested Plaintiff's termination when she made the request. Accordingly, Maple Knoll argues that, in effect, it requested that Plaintiff be transferred to a separate National Church site.

However, National Church and Maple Knoll agreed that Maple Knoll had the sole discretion to remove a person holding the Services Coordinator position where it deemed said person to be "unsatisfactory." (Doc. 17-2, Ex. 1). Moreover, the Agreement states that if an employee is removed from a site due to dissatisfaction with the employee's performance, National Church reserves the right to terminate the Agreement. (Doc. 21-1, Ex. 2). Accordingly, Maple Knoll knew that its decision could result in Plaintiff's termination. Under these terms, the adverse employment action at issue is not National Church's failure to place Plaintiff in another position, but her removal from the Service

Coordinator position in the first place.  Therefore, Plaintiff has alleged an adverse employment action.

### ii.    Causal Connection

To establish a causal connection, a plaintiff must produce sufficient evidence for one to infer that the defendant would not have taken the adverse employment action had the plaintiff not engaged in the protected activity.  *Barrett v. Lucent Tech., Inc.*, 36 F. App'x 835 (6th Cir. 2002).  That is, to establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Relevant factors to consider when determining causation include evidence that the employer treated the plaintiff differently than similarly situated employees, or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.  *Moon v. Transport Drivers, Inc*., 836 F.2d 226, 230 (6th Cir. 1987).  Where some time elapses between when the employer learns of a protected activity and the alleged adverse action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causation.  *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001).  *See, e.g., Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007) (temporal proximity "does not exist" when a multi-year period exists between protected conduct

16

and adverse action).[10]

Bolin stated that her "main concern" in terminating Plaintiff was that the residents might discover that Getz was gone, become inquisitive and ask questions of Plaintiff, and she might respond in a manner Bolin deemed inappropriate.  (Doc. 21-5 at 74).  Maple Knoll acknowledges this as a factor in its decision.  (Doc. 19 at 15).  Plaintiff could not relay allegedly-false information about Getz's termination to residents if she had not reported the sexual harassment that led to his firing in the first place.  Had Plaintiff not reported Getz harassing her, she would not have been removed and ultimately terminated.

Accordingly, Plaintiff has evidenced a causal connection between the protected activity and the adverse employment action.  Therefore, Plaintiff has stated a *prima facie* claim for retaliation.

### c.    Legitimate non-discriminatory reason

Now, the burden of proof shifts back to Maple Knoll to offer a legitimate non-discriminatory reason for the adverse employment action.  *Weigel v. Baptist Hosp.*, 302 F.3d 367, 377-78 (6th Cir. 2002).  The burden on the defendant at this stage of the *McDonnell Douglas* analysis is not to prove the existence of a nondiscriminatory reason for the adverse employment action.  Rather, "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

---

[10] *See also Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 344 (6th Cir. 2001) (rejecting three-year gap between protected activity and alleged retaliation as creating inference of retaliatory motive).

After Plaintiff made her complaint regarding Getz's conduct, Maple Knoll began to investigate her complaint.  (Doc. 21-5 at 18).  This investigation included interviews with several Maple Knoll employees which allegedly established that Plaintiff was engaging in gossiping behavior, which had the potential to be detrimental to the residents living at Maple Knoll's facilities.  Specifically, Plaintiff allegedly told others that Getz was a sexual predator and that the vulnerable residents at Maple Knoll should be protected from him.  (Doc. 21-5 at 41; Doc. 21-3 at 44-45).  The investigation also allegedly uncovered that Plaintiff had participated in a friendly, casual relationship with Getz prior to the February incident.  (Doc. 21-5 at 45).  According to the investigation, this relationship included sexual innuendo, flirtatious behavior, and occasionally neglect of duties, by both Plaintiff and Getz.  (*Id.* at 45, 52-54, 60-65).  During the course of Maple Knoll's investigation, Bolin concluded that Plaintiff could not effectively continue working at Maple Knoll: "Ann was very much struggling with the whole incident and that was going to be difficult for her, but more importantly to me, very potentially disruptive to my residents and their living environment if this was the type of discussion she was having openly with people."  (*Id.* at 74).

Maple Knoll argues that although its investigation was prompted by Plaintiff's complaint against Getz, the request for her removal arose from independent concerns regarding Plaintiff's own work behavior highlighted in that investigation.  Since there is no evidence that these "independent concerns" would have been raised absent Plaintiff's

allegations of sexual harassment, the Court cannot find as a matter of law that Maple Knoll's legitimate reason is in fact non-discriminatory.

### d. Pretext

Assuming, *arguendo*, that Maple Knoll established a legitimate non-discriminatory reason for Plaintiff's termination, the burden of production shifts back to Plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Plaintiff may establish that a proffered reason is a mere pretext by showing that: (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason; or (3) the stated reason was insufficient to explain defendant's action. *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998). The pretext inquiry evaluates whether the legitimate business reasons offered by the defendant were not its true reasons, but rather were a pretext for discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To make this showing, "the plaintiff must … put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

In determining whether a defendant had an "honest belief" in the proffered basis for the adverse employment action, courts in this circuit look to whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998).

19

The key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.  *Id.*

Here, Maple Knoll asserts that through its internal investigation it determined that Plaintiff "engaged in gossipy behavior, likely to be detrimental to the residents living at Maple Knoll's facilities, by telling others that Mr. Getz was a sexual predator and that the vulnerable residents there should be protected of him…Given Mr. Getz' history at Maple Knoll, these statements had no basis in fact."  (Doc. 19 at 16).  However, the allegation that Getz and Plaintiff had regularly engaged in sexual banter is a disputed issue of fact and ignores Plaintiff's accusation that Getz had engaged in unwanted, sexual harassment.[11]  Bolin also claims that witnesses observed Plaintiff snuggling up to Getz. (Doc. 21-5 at 94).  However, at her deposition, Kosar testified that the story she had told Bolin about Plaintiff and Getz's interaction was very different from Bolin's report of the incident.  (Doc. 21-3 at 45-47).  Additionally, Leathers' version of an inappropriate Christmas party photo is directly contradicted, first by Clayton's testimony that nothing untoward occurred at the party, and second, by the photograph itself.  (Doc. 21-2 at 68). There was also the report of a joke allegedly circulating among residents: "to find Dante,

---

[11] Specifically, the incidents of alleged sexual conversation or banter were never corroborated. Moreover, Michael Clayton, the maintenance supervisor at Maple Knoll, who was the source for many of these allegations, stated at his deposition that he was only repeating what Getz had told him.  (Doc. 21-2 at 18, 16-40, 41, 43).  In fact, Clayton specifically stated that he had not witnessed Plaintiff make any flirtatious comments to Getz.  (*Id.* at 28).  Moreover, during the investigation, no one ever gave Plaintiff a chance to respond to the allegations.  (Doc. 25 at ¶ 24).

look for Ann [Burt]." This could be interpreted in two ways: either Getz was following Plaintiff around or Plaintiff was following Getz around.

In fact, there is evidence that Getz had engaged in inappropriate behavior with other Maple Knoll employees. Specifically, Getz called Kosar at home, hoping to expand their working relationship into a friendship. (Doc. 21-3 at 25; Doc. 25 at ¶ 6). Furthermore, Getz regularly engaged Clayton in discussions about sexually related matters. (Doc. 21-2 at 18, 16-20, 43, 44). Even Bolin observed "I discerned through our conversation that [Getz] struggled with understanding what was appropriate for the workplace." (Doc. 21-5 at 37).

There are numerous disputed issues of fact, including the discrepancies in the in-house investigation, that call into question the legitimacy of Maple Knoll's proffered reasons for terminating Plaintiff. This Court cannot find as a matter of law that Maple Knoll made a reasonably informed and considered decision before removing Plaintiff. A jury *could* reasonably find that the rationale offered by Maple Knoll either had no basis in fact, did not actually motivate its decision, or was insufficient to warrant the challenged conduct. *Whet v. Fifth Third Bank*, 785 F.3d 230, 241 (6th Cir. 2015).[12]

---

[12] For example, in *Delaschmutt v. Wis-Pak Plastics, Inc.*, 990 F. Supp. 689 (N.D. Iowa 1998), the plaintiff reported an incident of sexual harassment by a coworker to management, and after a short investigation, that coworker was fired. Thereafter, the defendant began retaliating against plaintiff by increasing her workload, eventually forcing her to quit. *Id.* at 694-95. During the ensuing proceedings, the trial court determined that plaintiff's retaliation claim under Title VII survived summary judgment. The Court reasoned: "[i]t is conceivable that an employer could rid itself of a short-term problem by firing an alleged harasser, then attempt to rid itself of the long-term problem of the complaining person if it perceived that person to have the potential to be a chronic complainer." *Id.* at 702, n. 8.

### 2.    *National Church Residences Housing*

Plaintiff admits that "the adverse employment action at issue is not [National Church's] failure to place [her] in another position, but her removal from the Service Coordinator position in the first place."  (Doc. 24, PageID 681).  Accordingly, Plaintiff's ability to survive summary judgment necessarily turns on whether or not Maple Knoll's allegedly retaliatory animus can be attributed to National Church despite Plaintiff's admission that National Church was not involved in, nor had reason to doubt the accuracy of, the investigation leading to her removal as Service Coordinator.

### a.    *Prima Facie Case*

National Church maintains that Plaintiff cannot establish the fourth prong of her *prima facie* case, that a causal link existed between her engagement in protected activity and an adverse employment action.

Some courts have recognized the "cat's paw" theory of retaliation to allow a plaintiff to meet the *prima facie* case.[13]  In a "cat's paw" case, an unknowing supervisor is encouraged to take an adverse employment action by another employee who knows about the protected activity and has discriminatory animus about the use of the protected activity.  The cat's paw theory allows a plaintiff to meet the second and third prong of the *prima facie* analysis even when the firing supervisor had no direct knowledge of the protected activity.  To impute the supervisor's animus onto the employer, the employee

---

[13]  The term "cat's paw" derives from a fable in which a monkey tricks a cat into scooping chestnuts out of a fire so that the monkey can eagerly gobble them up, leaving none for the cat. *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006).

must show that: (1) the supervisor intended to cause an adverse employment action; and (2) the discriminatory action taken by the supervisor is a proximate cause of the adverse employment action. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (quoting *Staub*, 562 U.S. at 422).[14]

Even if Maple Knoll's investigatory findings were pretext for illegal retaliation, Plaintiff cannot use a "cat's paw" theory to impute a retaliatory animus to National Church. In her compliant, the only allegation Plaintiff levies against National Church is that it violated federal and state law by "ratifying" Maple Knoll's retaliation for complaining about Getz's conduct. (Doc. 1 at ¶¶ 21, 26). Notably, Plaintiff does not allege that National Church possessed its own illegal retaliatory animus, but rather that National Church violated the law by adopting Maple Knoll's retaliatory conduct.

To date, courts in this Circuit have only applied the "cat's paw" where an employer's supervisor has performed an act motivated by discriminatory/retaliatory animus intended to cause an adverse employment action and the act serves as the proximate cause of an adverse employment action. *Crane v. Mary Free Bed Rehab. Hosp.*, No. 8:13cv2330, 2015 U.S. App. LEXIS 21891, at *1 (6th Cir. Feb. 24, 2015). Courts in the Sixth Circuit have not addressed the factual scenario presented in this case:

---

[14] "Needless to say, the employer would be liable only when the supervisor acts within the scope of his employment, or when the supervisor acts outside the scope of his employment and liability would be imputed to the employer under traditional agency principles. We express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Id.*, n. 4. Accordingly, courts only impute liability to an employer where a plaintiff's supervisor possesses an illegal animus.

23

whether the "cat's paw" theory will, as a matter of law, impute liability to an employer in circumstances where a third party, who is neither an agent nor an employee of the employer, allegedly acts on an illegal animus.[15]

Plaintiff has failed to allege or provide any testimony that Foraker (or any other National Church supervisor) terminated Plaintiff in retaliation for making a complaint about Getz's harassment.[16] Because Plaintiff only alleges that National Church "ratified" Maple Knoll's retaliatory conduct and since Maple Knoll is a separate and distinct legal entity unaffiliated with National Church, Plaintiff is unable as a matter of law to prevail on her "cat's paw" theory of liability with respect to National Church.[17]

Accordingly, Plaintiff's retaliation claims against National Church fail as a matter of law and are dismissed.

---

[15] The holding in *Daniel v. Sargent & Lundy, LLC*, No. 09c7206, 2012 U.S. Dist. LEXIS 34013 (N.D. Ill. Mar. 14, 2012) is instructive. In *Daniel*, the plaintiff was employed by a cleaning company, ABM, who contracted with another company, S&L, to provide janitorial services at S&L's officers. While working at S&L the plaintiff was caught sleeping in a conference room by an S&L employee and banned by S&L from continuing to work in its offices. Upon S&L's ban, and without conducting an independent investigation as to the truthfulness of plaintiff's alleged misconduct, ABM removed plaintiff from the facility and demoted her inasmuch as another position was unavailable at the time of her removal from S&L. In analyzing whether or not an allegedly improper motive of S&L could be attributed to ABM's actions using a "cat's paw" theory of liability, the *Daniel* court found the transfer of retaliatory animus between joint employers inapplicable where ABM was told by S&L that the plaintiff could no longer work in its offices. ABM did not conduct the investigation leading to the plaintiff's removal, and there was no evidence that ABM did not have an "honest belief" that plaintiff was being removed for a non-discriminatory reason. *Id.* at 27-32.

[16] Foraker admitted that she never participated in the investigation, never reviewed any witness statements, and never spoke with the investigator. (Doc. 23 at 28).

[17] There is no case law authority that provides that a retaliatory animus may be transferred between joint employers using a "cat's paw" theory of liability.

### B.    Ohio Common Law Claim

Finally, Plaintiff alleges that Beth Bolin is personally liable under Ohio law for retaliating against her after complaining about sexual harassment.  Specifically, Plaintiff claims that Bolin is liable pursuant to: (1) Ohio Revised Code Sections 4112.02(J) and 4112.99; and (2) *Kerans v. Porter Paint*, 575 N.E.2d 428 (Ohio 1991).

### 1.    *Ohio Revised Code Sections 4112.02(J)*[18] *and 4112.99*[19]

R.C. 4112.02(A) makes it an unlawful discriminatory practice "for any employer, because of the…sex…of any person,…to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment or any matter directly or indirectly related to employment."[20]

Unlike federal law, Ohio law allows for individual employees, supervisors, and managers to be personally liable for unlawful discriminatory acts committed by such

---

[18] Pursuant to Ohio Revised Code Section 4112.02(J), it is an unlawful discriminatory practice:

> (J) For any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

[19] Ohio Revised Code Section 4112.99 states that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."

[20] Ohio Revised Code Section 4112.08 mandates that Ohio Revised Code Section 4112 "be construed liberally for the accomplishment of its purposes."  For example, in *Helmick v. Cincinnati Word Processing, Inc.*, 543 N.E.2d 1212, 1215 (Ohio 1989), the Court stated that "there appears to be little question that R.C. Chapter 4112 is comprehensive legislation designed to provide a wide variety of remedies for employment discrimination in its various forms."

persons in violation of Ohio Revised Code Chapter 4112. *Rivera v. Rent A Center, Inc.*, No. 101959, 2015 Ohio App. LEXIS 3649, at *9-10 n. 2 (Ohio App. Sept. 17, 2015).[21] In *Genaro v. Cent. Transport, Inc.,* 703 N.E.2d 782, 787-88 (Ohio 1999), the Supreme Court of Ohio held that "a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112." *Id.* at syllabus.

"R.C. 4112.01(A)(2) defines "employer" as "any person employing four or more persons within the state,…and *any person acting directly or indirectly in the interest of an employer*." (Emphasis added). It is clear that the definition of "employer," by its very terms, encompasses individual supervisors and managers whose conduct violates the provisions of Chapter 4112. The Court in *Genaro* based its conclusion, in part, on the fact that the definition of "employer" found in Ohio Revised Code Section 4112.01(A)(2) differs in several critical aspects from its Title VII counterpart. *Id.* 703 N.E.2d at 787.[22]

---

[21] "Under the framework of R.C. Chapter 4112, the liability of the supervisor is not based on his status as an agent of the company. Rather, a supervisor is liable because he, like the company for which he works, meets the statutory definition of an employer. This is reflected in the fact that a co-worker who engages in discriminatory conduct would not fall within the definition of an employer and, consequently, may not be held individually liable for his conduct." *Edwards v. Ohio Inst. of Cardiac Care*, 868 N.E.2d 721, 734 (Ohio App. 2007). "The purpose of including supervisors and managers as employers was to expand the parties who could be held responsible for conduct that violated R.C. Chapter 4112 and to further the anti-discrimination goals of the statute—not to provide an escape clause for the employing company which, due to greater assets and resources, may be more willing to enter into and continue protracted litigation." *Id.* at 735.

[22] There is some argument about whether *Genaro* is still good law. *Longoria v. Autoneum N. Am., Inc.*, No. 3:14cv2648, 2015 U.S. Dist. LEXIS 147613, at *12-13 (N.D. Ohio Oct. 30, 2015). However, in the absence of any authority to the contrary, this Court is bound by the holding in *Genaro*.

26

Under this analysis, Plaintiff alleges that Bolin is personally liable to the same degree as Maple Knoll for her role in directing the unlawful retaliation. In reviewing retaliation claims pursuant to Chapter 4112, Ohio courts look to federal case law. Specifically, to support a claim for retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she was the subject of adverse employment action; and (3) a causal link existed between the protected activity and the adverse action. *Chandler v. Empire Chem., Inc.*, 650 N.E.2d 950, 954 (Ohio App. 1994) (citing *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984)). If the plaintiff meets this burden, "the employer must then articulate a legitimate, nondiscriminatory reason for its action and the plaintiff must then show the reason to be pretextual." *Id.* For the reasons stated *supra* in Section IV.A, Plaintiff states a common law claim for unlawful discrimination against Beth Bolin.

## 2. *Kerans v. Porter Paint*

Plaintiff claims that Bolin is also liable because this is a *Kerans* sexual harassment case. *Hart v. Justarr Corp.*, 649 N.E.316, 319 (Ohio App. 1994). In *Kerans v. Porter Paint Co.*, the Ohio Supreme Court reasoned that an "employer has a duty to provide its employees with a safe work environment and, thus, may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees." 575 N.E.2d 428, 433 (Ohio 1991).

However, *Kerans* requires proof that "the employee has a past history of sexually harassing behavior about which the employer knew or should have known…" *Id.*, 575

N.E.2d at 493. There is no evidence that either Maple Knoll or Bolin had knowledge of prior acts of sexual harassment committed by Getz, or that either should have known of any such prior acts.

Accordingly, Plaintiff's common law *Kerans* claim fails as a matter of law.

## V.   CONCLUSION

Accordingly, for these reasons:

(1) Defendant National Church Residences Housing Group, Inc.'s motion for summary judgment (Doc. 17) is **GRANTED** and National Church is terminated as a defendant in this case; and

(2) Defendants Maple Knoll Communities, Inc.'s and Beth Bolin's motion for summary judgment (Doc. 19) is **DENIED**.

**IT IS SO ORDERED**.


Date:  7/19/16                                     *s/ Timothy S. Black*
                                                   Timothy S. Black
                                                   United States District Judge